UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VLADIMIR B., | Case No.:  19-cv-00779-WQH-JLB |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| ANDREW SAUL, Acting Commissioner of Social Security,[1] | |
| Defendant. | **[ECF Nos. 19; 22]** |

## I.    <u>INTRODUCTION</u>

This matter is before the Court on cross-motions for summary judgment.  (ECF Nos. 19; 22.)  Plaintiff Vladimir B. moves under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying his application for a period of disability and disability insurance benefits under Title II of the Social Security Act.

This Report and Recommendation is submitted to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b) and Civil Local Rule 72.1(c) of the

---

[1]    Andrew Saul is hereby substituted as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

1

United States District Court for the Southern District of California.  After a careful review of the moving and opposing papers, the Administrative Record, and the applicable law, the Court **RECOMMENDS** that the District Court **GRANT** Plaintiff's Motion for Summary Judgment, **DENY** the Commissioner's Cross-Motion for Summary Judgment, and that judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## II.    PROCEDURAL BACKGROUND

On March 2, 2015, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability commencing December 17, 2013. (Administrative Record ("AR") 198.)  After his application was denied initially and upon reconsideration, Plaintiff requested a hearing before an administrative law judge ("ALJ") on June 10, 2016.  (AR 84, 106, 125.)  On January 11, 2018, Plaintiff, his attorney, and vocational expert ("VE") John Kilcher appeared before ALJ Andrew Verne.  (AR 34.)  In a decision dated May 17, 2018, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act.  (AR 28.)  The ALJ's decision became the final decision of the Commissioner on February 27, 2019, when the Appeals Council denied Plaintiff's request for review.  (AR 3.)  On April 22, 2019, Plaintiff requested an extension of time to file the instant civil action.  (AR 2.)  Plaintiff's request was granted (AR 1), and this civil action timely followed (ECF No. 1).

## III.    SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process.  *See* 20 C.F.R. § 404.1520.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 17, 2013, Plaintiff's alleged disability onset date.  (AR 19.)

At Step Two, the ALJ found that Plaintiff had the following severe impairments: angina; hypertension; obesity; mild foraminal narrowing left C5-6 without neural foraminal compression; post-traumatic stress disorder ("PTSD"); generalized anxiety disorder; and major depressive disorder.  (*Id.*)

2

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments.  (AR 20.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC"):

> to lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally; stand and/or walk for 6 hours, with normal breaks; sit for 6 hours, with normal breaks; occasionally able to climb ramps and stairs; never climb ladders, ropes or scaffolds; no overhead reach bilaterally; avoid concentrated exposure to extreme cold, vibrations; avoid even moderate exposure to hazards; understand, remember, and carry simple, routine, and repetitive tasks, with breaks every 2 hours; . . . no interaction with co-workers and supervisors involving no more than a brief exchange of information or hand-off of product.

(AR 21.)

At Step Four, the ALJ compared the RFC assessed to the demands of Plaintiff's past relevant work as floor installer, Dictionary of Occupational Titles ("DOT") No. 860.381-022.  (AR 26.)  The ALJ accepted the VE's testimony that a hypothetical person with Plaintiff's age, education, work experience, and RFC would be unable to perform work as a floor installer, either as actually done or as generally done in the national economy.  (*Id.*)

At Step Five, the ALJ determined whether Plaintiff could perform other jobs that exist in significant numbers in the national economy.  (AR 26–27.)  The ALJ accepted the VE's testimony and found that a hypothetical person with Plaintiff's age, education, work experience, and RFC would be able to perform the requirements of representative unskilled (svp-2) light occupations such as: garment sorter (DOT No. 222.687-014), with 35,000 national jobs; marker II (DOT No. 920.687-126), with 20,000 national jobs; and garment folder (DOT No. 789.687-066), with 41,000 national jobs.  (AR 27.)  Accordingly, because the ALJ found that Plaintiff could make a successful adjustment to other work that exists in significant numbers in the national economy, a finding of not disabled was appropriate.  (*Id.*)

///

## IV.   STANDARD OF REVIEW

The Social Security Act allows for unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. § 405(g).  The scope of judicial review, however, is limited.  The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error; or (2) the ALJ's determinations are not supported by substantial evidence in the record as a whole.  *See Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000).  Substantial evidence is "more than a mere scintilla, but may be less than a preponderance."  *Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001).  Substantial evidence is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion."  *Id.*; *accord Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2003).

In making this determination, the Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion.  *See Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988).  Where the evidence can reasonably be construed to support more than one rational interpretation, the Court must uphold the ALJ's decision.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  *See Lewis*, 236 F.3d at 509.

## V.   PLAINTIFF'S CLAIMS OF ERROR

The Court construes Plaintiff's Motion for Summary Judgment as raising the following claims of error:

1.    The ALJ erred in assessing Plaintiff's mental RFC when he rejected the medical opinion of Dr. Yaroslav Kushnir, Plaintiff's treating psychiatrist, and failed to sufficiently explain how he assessed Plaintiff's mental RFC.  (ECF No. 19 at 8–12.)

2.    The ALJ erred in assessing Plaintiff's physical RFC by giving substantial weight to the state agency physicians' opinion that Plaintiff was limited to "no constant or extreme overhead reach or stretch bilaterally that would involve extreme extension of the

4

neck but can do at or below shoulder level 1/3 to 2/3 of the time" and "no extreme neck flexion or extension," but omitting these nonexertional limitations from Plaintiff's physical RFC without explanation. (*Id.* at 13–14.)

       3.     The ALJ erred in his credibility determination because he failed to specifically identify which of Plaintiff's symptom allegations he discredited. (*Id.* at 14–16.)

## VI.   <u>DISCUSSION</u>

## A.   Claim 1—The ALJ's Mental RFC Determination and Rejection of Dr. Kushnir's Opinion

       1.     <u>Parties' Arguments</u>

Plaintiff's first claim of error challenges the ALJ's rejection of Dr. Kushnir's functional assessment of Plaintiff contained in a December 14, 2017 Medical Impairment Questionnaire. Plaintiff argues that the two reasons proffered by the ALJ—that Dr. Kushnir's opinion was undermined by mostly unremarkable mental status examinations and progress notes that showed Plaintiff's mood and anxiety had improved—were legally insufficient reasons to reject the opinion. (*See* ECF No. 19 at 8–10.) In response, the Commissioner defends the ALJ's decision by arguing that the ALJ provided good reasons supported by substantial evidence for rejecting Dr. Kushnir's opinion. (*See* ECF No. 22 at 19–21.)

       2.     <u>Summary of Relevant Evidence Concerning Plaintiff's Mental Impairments</u>

Plaintiff first saw Dr. Kushnir in March 2015 for a psychiatric consultation. (AR 738–39.) Upon mental status examination, Dr. Kushnir found Plaintiff's anxiety to be severe. (AR 739, 1257.) Plaintiff saw Dr. Kushnir next on April 16, 2015. (AR 740, 1256.) Upon mental status examination, Dr. Kushnir found that Plaintiff exhibited rapid speech, a blunt and flat affect, disorganized thought process, and below average cognition. (AR 740, 1256.)

On April 23, 2015, Plaintiff presented to Dr. Hamid Karimi for an initial psychiatric evaluation. (AR 784.) Plaintiff reported that his anxiety was an eight out of ten and his depression was a seven to nine out of ten. (*Id.*) He further reported feeling overwhelmed

and "feelings of helplessness and hopelessness." (*Id.*) Upon mental status examination, Dr. Karimi found Plaintiff's behavior "regressive, overwhelmed, frustrated and irritated"; his mood "anxious, irritable and depressed"; his speech pressured; and his affect "liable and fluctuating." (AR 786.) Dr. Karimi diagnosed Plaintiff with major depression (recurrent, moderate, and symptomatic), generalized anxiety, and PTSD and assessed a Global Assessment of Functioning ("GAF") score of 55. (AR 787.)

On April 29, 2015, Plaintiff saw Dr. Karimi for a therapy session. (AR 781.) Plaintiff reported that sometimes he was "in so much pain" that he would lose his balance. (*Id.*) Upon mental status examination, Dr. Karimi found Plaintiff's behavior "agitated, regressive, overwhelmed, frustrated, irritated, fearful and tearful"; his affect "appropriate, liable and fluctuating within low to anxious range"; and his mood "euthymic, anxious, irritable and depressed." (AR 782.) He further found impaired short-term memory and pressured speech. (*Id.*) Dr. Karimi noted that Plaintiff had "responded well to the empathetic and validating approach on his preoccupations with fears and anxieties associated with his PTSD" from being tortured in the Russian army. (AR 783.)

Plaintiff next saw Dr. Karimi on May 6, 2015, for a therapy session. (AR 777.) Plaintiff reported that he was "having difficulty breathing" and walking. (*Id.*) He spoke about how his dad had physically abused him and "exhibited preoccupations with feeling[s] of anxiety, irritability, aggravated depression, tearful[ness], agitation, intense fear, frustration, sense of overwhelmed, internalized anger." (*Id.*) His thought process was "circumstantial" and "distressed secondary to preoccupations with multiple serious traumatic events in his life with sad to irritated range of affect." (*Id.*) Dr. Karimi reported that there was "no change" in Plaintiff's mental status. (*Id.*)

The next day, Plaintiff presented to Dr. Dennis Ordas for an initial psychiatric evaluation. (AR 773.) Dr. Ordas noted that "[s]ymptoms of anxiety and depression dominat[ed] [Plaintiff's] clinical presentation." (*Id.*) Upon mental status examination, Dr. Ordas found that Plaintiff exhibited pressured speech, anxious mood, and poor reasoning.

///

(AR 774.)  Dr. Ordas diagnosed Plaintiff with major depression (recurrent and moderate), generalized anxiety, and PTSD.  (AR 775.)

On May 13, 2015, Plaintiff saw Dr. Karimi for a therapy session.  (AR 769.)  Dr. Karimi noted that Plaintiff "continue[d] to exhibit preoccupations with flashbacks of [his] past . . . [and] with fears, anxiety, [a] sense of [being] overwhelmed, irritability, agitation, and depression with low to blunted range of affect."  (*Id.*)  Dr. Karimi reported "no change" in mental status."  (*Id.*)

On May 15, 2015, Dr. Ordas completed a psychiatric admission assessment of Plaintiff.  (AR 743.)  Dr. Ordas found that Plaintiff "was an appropriately groomed male who attempt[ed] to be cooperative yet [would] get quite tangential and not actually give good information at times."  (AR 744.)  Upon mental status examination, he noted that Plaintiff's mood was "clearly depressed" and described his anxiety as "just through the roof."  (*Id.*)  He found Plaintiff's thought process "intact for the most part with the exception of . . . tangential thinking at times" and insight "fair at best."  (*Id.*)  He diagnosed Plaintiff with major depressive disorder (recurrent and severe without psychotic features), generalized anxiety disorder, and PTSD and assigned Plaintiff a GAF score of 40.  (AR 745.)  He recommended that Plaintiff "be admitted to the Tri-City Medical Center Intensive Outpatient Program" to initially attend "three days per week, three groups per day."  (*Id.*)

That same day, a therapist at Tri-City Medical Center completed a Brief Psychiatric Rating Scale of Plaintiff, finding that Plaintiff exhibited "moderate severe" somatic concern, anxiety, guilt feelings, a depressed mood, and moderate motor retardation.  (AR 746.)  An examining psychiatrist completed an Outpatient Behavioral Health Services Biopsychosocial Assessment of Plaintiff and reported Plaintiff's "need for admission" as "depressed and anxious mood with significantly impaired [activities of daily living] and passive [suicidal ideation]."  (AR 755.)  Upon mental status examination, the psychiatrist found that Plaintiff exhibited an anxious and depressed mood with a blunted affect, circumstantial thought process, and fair/poor judgment.  (*Id.*)

///

Plaintiff returned to Dr. Karimi for a therapy session on May 20, 2015.  (AR 765.) Dr. Karimi noted that Plaintiff's somatization was "precipitated by his allegedly traumatic exposure to life in the Russian Army" and that he "exhibit[ed] preoccupations with feelings of fear and anxiety" and was "overwhelmed by his obsessive, grandiose, and overly dramatic presentation of his traumatic experiences." (*Id.*)  Dr. Karimi reported "no change" in Plaintiff's mental status. (*Id.*)  Plaintiff saw Dr. Karimi again a week later on May 27, 2015.  (AR 762.)  Dr. Karimi noted that Plaintiff was "doing better" and "exhibited mild level anxiety, improved mood, [and was] more focused on his object[,] inadequate range of affect." (*Id.*)  Dr. Karimi, however, also reported "no change" in mental status. (*Id.*)

On August 4, 2015, on initial review, state agency physician Aroon Suansilppongse reviewed Plaintiff's medical records and assessed moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration.  (AR 77.)  He further found that Plaintiff was moderately limited in his ability to: maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (AR 81–83.)  Dr. Suansilppongse opined that Plaintiff was able to carry out instructions, but "[h]is anxiety and depressive reaction and alleged pain would interfere with his ability for sustained concentration and persistence or for task completion."  (AR 82.)   Dr. Suansilppongse also opined that Plaintiff's "social avoidance and infrequent episodes of panic attacks, crying spells and irritability would occasionally interfere with his ability for appropriate interaction with supervisors, coworkers or the public," but he would "be able to complete tasks with infrequent contact with others." (*Id.*)  State agency physician Anna M. Franco affirmed Dr. Suansilppongse's findings upon reconsideration.  (AR 10–04.)

///

8

Plaintiff presented to Dr. Kushnir at least[2] fifteen times from July 2015 to January 2018, and Dr. Kushnir completed a mental status examination of Plaintiff each time:

- On July 9, 2015, Plaintiff exhibited a blunt and bland affect, moderate to severe[3] depression, and moderate anxiety. (AR 1255.) Dr. Kushnir's treatment plan was to evaluate and adjust Plaintiff's current psychotic medication and to manage Plaintiff's mood and/or psychotic symptoms with medication. (*Id.*)

- On August 13, 2015, Plaintiff exhibited suicidal ideation, pressured speech, a blunt and liable affect, poor insight/judgment, and moderate to severe anxiety and depression. (AR 1253.) Dr. Kushnir's treatment plan for Plaintiff remained the same. (*Id.*)

- On October 15, 2015, Plaintiff exhibited a blunt and liable affect, circumstantial thought process, fair insight/judgment, and moderate to severe depression. (AR 1252.) Dr. Kushnir's treatment plan for Plaintiff remained the same. (*Id.*)

- On January 14, 2016, Plaintiff exhibited a blunt and flat affect and moderate depression. (AR 1251.) Dr. Kushnir's treatment plan for Plaintiff remained the same. (*Id.*)

- On February 18, 2016, Plaintiff presented with a disheveled appearance and with slow and slurred speech. (AR 1254.) Plaintiff exhibited suicidal ideation, a blunt and flat affect, a thought-blocking thought process, and severe depression. (*Id.*) Dr. Kushnir checked boxes for "moderate," "severe," and "extreme" as to the level of Plaintiff's anxiety. (*Id.*) Dr. Kushnir added

---

[2] Several dated progress reports from Dr. Kushnir appear in the record but contain no medical assessment. (AR 1238, 1242, 1247–48.)

[3] Dr. Kushnir checked boxes for both "moderate" and "severe." The Court interprets this to mean moderate to severe.

9

three goals to Plaintiff's treatment plan: prevent immediate danger to self or others, resolve suicidal thoughts, and assist to identify coping mechanisms. (*Id.*)

- On April 21, 2016, Plaintiff exhibited a blunt affect, circumstantial thought process, and moderately severe depression. (AR 1250.) Dr. Kushnir added a goal of reducing psychosis to Plaintiff's treatment plan. (*Id.*)

- On June 2, 2016, Plaintiff exhibited a blunt and flat affect and moderate to severe depression and anxiety. (AR 1249.) Dr. Kushnir's treatment plan for Plaintiff was to evaluate and adjust current psychotic medications, manage mood and/or psychotic symptoms with medication, and reduce psychosis. (*Id.*)

- On November 15, 2016, Plaintiff exhibited a depressed mood, anxious affect, suicidal ideation, and fair judgment. (AR 1246.) Dr. Kushnir noted that Plaintiff's symptoms had "not resolved" and that Plaintiff was still depressed and "unable to work."[4] (*Id.*)

- On December 15, 2016, Plaintiff exhibited a depressed mood, an anxious affect, and fair judgment. (AR 1245.) Under abnormalities, Dr. Kushnir reported that Plaintiff was "slow." (*Id.*) Dr. Kushnir noted that Plaintiff was feeling hopeless. (*Id.*)

- On February 23, 2017, Plaintiff exhibited a depressed mood and an anxious affect. (AR 1244.) Dr. Kushnir seemed[5] to note that Plaintiff was "disabled." (*Id.*)

---

[4]     On November 15, 2016, Dr. Kushnir's progress note template changed such that it included different mental status examination criteria check boxes and no longer included a treatment plan assessment.

[5]     The Court has done its best to construe some of Dr. Kushnir's handwritten notes, as many of them are illegible.

10

- On April 20, 2017, Plaintiff exhibited an anxious affect. (AR 1243.) Dr. Kushnir noted that Plaintiff was depressed, forgetting things, having panic attacks, and "still unable to function." (*Id.*)

- On October 26, 2017, Plaintiff exhibited a flat, anxious, and blunted affect and his thought content included feelings of unworthiness and helplessness. (AR 1241.) Dr. Kushnir's clinical impression was that Plaintiff had regressed, and he gave Plaintiff a "poor" assessment. (*Id.*)

- On November 30, 2017, Plaintiff's speech was hesitant and he exhibited a flat, anxious, and blunted affect. (AR 1240.) His thought content included feelings of unworthiness and helplessness. (*Id.*) Dr. Kushnir's clinical impression was that Plaintiff was "unable to function." (*Id.*)

- On December 14, 2017, Plaintiff exhibited a flat, anxious, and blunted affect. (AR 1239.) Dr. Kushnir's clinical impression was that Plaintiff was "still depressed, with panic attacks." (*Id.*)

During this time, Plaintiff also presented to Dr. Gregory Nicholson for a psychiatric consultative examination on March 23, 2016. (AR 832.) Plaintiff arrived to the examination in a wheelchair and appeared neatly groomed. (*Id.*) Dr. Nicholson noted that Plaintiff was feeling depressed and paranoid and reported having visual hallucinations. (AR 833.) Upon mental status examination, Dr. Nicholson found that Plaintiff "endorsed hallucinations and paranoia," was depressed, and had a dysphoric affect. (AR 835.) Dr. Nicholson noted that Plaintiff had "showed some cognitive defects" upon mental status examination. (AR 836.) Dr. Nicholson diagnosed Plaintiff with anxiety disorder, psychotic disorder, and depressive disorder and assessed a GAF score of 50. (*Id.*) Dr. Nicholson found mild limitations in Plaintiff's functional abilities. (*Id.*)

Dr. Kushnir completed a Mental Impairment Questionnaire of Plaintiff on December 14, 2017. (AR 1223.) Dr. Kushnir's clinical findings of Plaintiff included "depressed mood, lack of interest, constricted affect, lack of patience, anxiety with feelings of hopelessness, despondence, lack of motivation and diminished interest in life." (*Id.*) Dr.

Kushnir assessed a "guarded to poor" prognosis, as Plaintiff had "shown limited improvement in two and a half years." (*Id.*)

Dr. Kushnir made the following assessment of Plaintiff's mental ability and aptitude to do unskilled work:

- He had a limited but satisfactory ability to:
  - ask simple questions or request assistance; and
  - be aware of normal hazards and take appropriate precautions.

- He had a seriously limited ability to:
  - understand and remember very short and simple instructions;
  - maintain attention for two-hour segments;
  - maintain regular attendance and be punctual within customary, usually strict tolerances; and
  - accept instructions and respond appropriately to criticism from supervisors.

- He was unable to meet competitive standards of performing at a consistent pace without an unreasonable length of rest periods.

- He had no useful ability to:
  - remember work-like procedures;
  - carry out very short and simple instructions;
  - sustain an ordinary routine without special supervision;
  - work in coordination with or proximity to others without being unduly distracted;
  - make simple work-related decisions;
  - complete a normal workday and workweek without interruptions from psychologically based symptoms;
  - get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;
  - respond appropriately to changes in a routine work setting; and
  - deal with normal work stress.

(AR 1225.)  Dr. Kushnir did not provide any medical or clinical findings to support his assessment.

Dr. Kushnir made the following assessment of Plaintiff's mental ability and aptitude to do semiskilled and skilled work:

- He was unable to meet competitive standards in:
  - carrying out detailed instructions; and
  - setting realistic goals or making plans independently of others.

- He had no useful ability to:
  - understand and remember detailed instructions; and
  - deal with stress of semiskilled and skilled work.

(AR 1226.) Dr. Kushnir supported his assessment by stating, "Patient's impairment affects his memory, concentration and ability to focus.  His lack of patience and irritability and impulsivity leads to poor judg[ment] and lack of coordination with details[,] therefore not completing tasks correctly.  In addition, his anxiety will affect his performance by increasing the distractibility and limit his effectiveness."  (*Id.*)

Dr. Kushnir made the following assessment of Plaintiff's mental ability and aptitude to do particular types of jobs:

- He was unable to meet competitive standards in:
  - interacting appropriately with the general public; and
  - adhering to basic standards of neatness and cleanliness.

- He had no useful ability to:
  - maintain socially appropriate behavior;
  - travel in unfamiliar places; and
  - use public transportation.

(*Id.*)  Dr. Kushnir supported his assessment by stating, "Again his illness affects his ability to relate to people because of anxiety, of poor concentration, forgetfulness, lack of adherence to focus on action, self[-]criticism and impulsivity leads to poor performance."  (*Id.*)

Dr. Kushnir opined that Plaintiff's psychiatric conditions exacerbated his experience of pain, and that Plaintiff had extreme functional limitations in his activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace. (AR 1226–27.)  Dr. Kushnir further opined that Plaintiff's anxiety disorder rendered him completely unable to function independently outside his home.  (AR 1227.)  On average, ///

Dr. Kushnir anticipated that Plaintiff's impairments or treatment would cause him to be absent from work more than four days per months.  (AR 1228.)

3.   Legal Standard

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the claimant; (2) those who examined but did not treat the claimant; and (3) those who did neither.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  A treating physician's opinion is generally entitled to more weight than an examining physician's opinion, and an examining physician's opinion is generally entitled to more weight than a non-examining physician's opinion.  *Id.*  This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).  The law is well established in the Ninth Circuit that, if the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 830.  Where a treating physician's opinion is controverted, it may be rejected only if the ALJ makes findings setting forth "specific and legitimate reasons" that are based on "substantial evidence in the record" for rejecting the opinion.  *Id.* (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

Under the regulations governing claims filed before March 27, 2017, such as here, if a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  20 C.F.R. § 404.1527(c)(2).  Where substantial evidence in the record contradicts the treating physician's opinion, or the opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques, it is no longer entitled to controlling weight.  *Id.*; *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  That does not mean, however, that the opinion should be rejected, for "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."  SSR 96–2p, 1996 WL 374188, at *4 (July 2, 1996); *see also Orn*, 495 F.3d at 632–33 ("Even when contradicted

14

by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to deference.'" (quoting SSR 96–2p, 1996 WL 374188, at *4)).

   4.   <u>The ALJ failed to articulate specific, legitimate reasons supported by substantial evidence for rejecting Dr. Kushnir's opinion</u>.

   The ALJ addressed Dr. Kushnir's functional assessment of Plaintiff as provided in the December 14, 2017 Mental Impairment Questionnaire as follows:

> Yaroslav[] Kushnir, M.D., completed a mental functional assessment on December 14, 2017 (Exhibit 21F). In many functional domains, he opined that the claimant has "no useful ability to function" such as in the ability to remember work-like procedures, to carry out very short and simple instructions, sustain an ordinary routine without special supervision; or is "unable to meet competitive standards" (Exhibit 21F/3-4). Further, he opined that the claimant has "extreme" inability to maintain activities of daily living; to maintain social functioning, and to maintain concentration, persistence and pace (Exhibit 21F/5). He expected the claimant to be absent from work more than 4 days per month due to his impairments or treatment. I have given very little weight to the opinion of Dr. Kushnir. His opinion is undermined by the mostly unremarkable mental status examinations of record (e.g. Exhibits 11F/3; 12F/4; 13F/3, 6, 10, 14-15, 18, 22, 26; 18F/5-6), including his own clinical findings contained in his mental status examinations (Exhibit 23F/1, 3-5, 7-10, 13-22). His opinion is inconsistent with the progress notes that show with appropriate treatment, the claimant's mood has improved such that his anxiety was considered to be mild (e.g. Exhibit 13F/2).

(AR 25.) As set forth above, Dr. Kushnir's functional assessment of Plaintiff included more extreme functional limitations than the assessments of psychiatric consultative examiner Dr. Nicholson and the non-examining state agency physicians. Therefore, because Dr. Kushnir was Plaintiff's treating psychiatrist, the ALJ could reject his opinion only with specific, legitimate reasons based on substantial evidence in the record. *Lester*, 81 F.3d at 830.

///

///

///

The parties agree that the ALJ provided at least two reasons for rejecting Dr. Kushnir's opinion.[6]  The first is that Dr. Kushnir's opinion was undermined by "mostly unremarkable" mental status examinations, including his own.  The second is that Dr. Kushnir's opinion was inconsistent with "progress notes" that showed Plaintiff's mood had improved and his anxiety was considered mild.  (AR 25.)  The Court agrees with Plaintiff that these were not legally sufficient reasons for rejecting Dr. Kushnir's opinion.

The Court finds that the first reason proffered by the ALJ is unsupported by substantial evidence, for not all of the mental status examinations in the record, including examples cited by the ALJ, could be reasonably characterized as mostly unremarkable.  For example, the ALJ cites to Dr. Ordas' mental status examination from March 15, 2015.  At that appointment, Dr. Ordas assessed Plaintiff's anxiety as "just through the roof" and insight as "fair at best."  (AR 744.)  The ALJ cites to Dr. Karimi's mental status examination from April 29, 2015.  (AR 782.)  There, Dr. Karimi described Plaintiff's behavior as "agitated, regressive, overwhelmed, frustrated, irritated, fearful and tearful," found Plaintiff's speech pressured, his affect "appropriate, liable and fluctuating within low to anxious range," his mood "euthymic, anxious, irritable and depressed," and his short-term memory impaired.  (*Id.*)  The ALJ also cites to mental status examinations where Plaintiff was found to have "below average cognition" (AR 1256), "moderate motor retardation" (AR 746), and "some cognitive defects" (AR 836).  Further, not all of Dr. Kushnir's mental status examinations cited by the ALJ could fairly be described as mostly unremarkable or necessarily undermining of his later functional assessment of Plaintiff.  Dr. Kushnir often described Plaintiff's depression and anxiety as moderately severe or

---

[6]    As noted by Plaintiff in his reply, the Commissioner offers a third reason for rejecting Dr. Kushnir's functional assessment—that it was inconsistent with the state agency physicians' and consultative examiner's assessment.  (ECF No. 22 at 21.)  The Court declines to address this argument, as it was not proffered by the ALJ.  *See Orn*, 495 F.3d at 630 (stating that a court "may not affirm the ALJ on a ground upon which he did not rely").

severe (AR 739, 1249–50, 1252–55) and on one occasion, indicated that Plaintiff's anxiety was extreme (AR 1254).  The ALJ also cites to several of Dr. Kushnir's progress notes where Dr. Kushnir's clinical impression of Plaintiff was that he was "unable to work" (AR 1246) or "unable to function" (AR 1240, 1243).

Additionally, the Court finds that the ALJ's reasoning is not sufficiently specific.  It was incumbent upon the ALJ to specify in what respects Dr. Kushnir's opinion was undermined by the mental status examinations.  Although the ALJ cited to the record, he did not identify the objective medical evidence within the mental status examinations or specify which of Dr. Kushnir's clinical findings undermined his functional assessment. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (stating that an ALJ provides "specific and legitimate reasons" for rejecting an opinion by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings").  The Commissioner defends the ALJ's reasoning by pointing to specific mental status examinations and analyzing their findings (*see* ECF No. 22 at 20–21), but the ALJ offers no such analysis.  Moreover, "it is not the Court's function to comb through the record to find specific conflicts when the ALJ makes this kind of general" finding. *Carranza-Villalobos v. Berryhill*, Case No.: 17-cv-02273-BEN (RNB), 2018 WL 3490800, at *5 (S.D. Cal. July 18, 2018), *adopted by* 2018 WL 6601087 (S.D. Cal. Dec. 17, 2018).  Accordingly, the Court finds that the ALJ's first reason for rejecting Dr. Kushnir's opinion is not legally sufficient.

The Court likewise finds that the second reason proffered by the ALJ for rejecting Dr. Kushnir's opinion—that "progress notes" indicated that Plaintiff's mood had improved and anxiety was mild—is not a legitimate reason supported by substantial evidence.  The ALJ is correct in that Dr. Karimi stated that Plaintiff was "doing better" and "exhibited a mild level of anxiety" and "improved mood" on May 27, 2015.  (AR 762.)  However, even after a thorough review of the Administrative Record, the Court cannot find any other instance where it was reported that Plaintiff's anxiety, or any other mental impairment, was improving.  Tellingly, the ALJ states that Dr. Kushnir's opinion was inconsistent with

"progress notes" showing improvement, but both he and the Commissioner cite to a single progress note. (ECF No. 22 at 21 ("[T]he record shows that Plaintiff's symptoms improved with treatment." (citing AR 762)).) Throughout the two and a half years that Dr. Kushnir treated Plaintiff, he never indicated that Plaintiff's mental impairments were improving (*see* AR 1223), and almost all of Dr. Kushnir's treatment records after May 27, 2015, described Plaintiff's anxiety as moderate or extreme. *See supra* pp. 9–11. Further, as Plaintiff highlights, Dr. Nicholson gave Plaintiff a GAF score of 50 on March 23, 2016, several months after Dr. Karimi's statement concerning Plaintiff's improvement.[7] Accordingly, the Court finds that the ALJ's second reason for rejecting Dr. Kushnir's opinion was not a legitimate reason supported by substantial evidence.

For the foregoing reasons, the Court finds that the ALJ failed to articulate specific and legitimate reasons supported by substantial evidence for rejecting Dr. Kushnir's opinion. Further, the Court is unable to determine that the ALJ's error was "inconsequential to the ultimate nondisability determination" and therefore harmless. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).[8]

///

///

---

[7]   Per the hearing decision, a GAF score "in the range of 50 and under is consistent with 'serious' symptoms or any serious impairments in limitations in social, occupational, or school functioning." (AR 25 n.1.)

[8]   The Court's conclusion that the ALJ failed to properly reject Dr. Kushnir's opinion regarding Plaintiff's mental functional limitations renders it unnecessary to address Plaintiff's additional claim of error regarding the ALJ's mental RFC determination. Because it will be necessary for the ALJ to reconsider Plaintiff's mental RFC determination on remand, there is no need to address the Plaintiff's claim that the ALJ's decision should be reversed for "inventing an unexplained [mental] RFC." (ECF No. 19 at 10.) Further, Plaintiff acknowledges that a finding of error based on the ALJ's failure to properly reject Dr. Kushnir's opinion renders his second argument "redundant and moot." (*Id.*) And, as Plaintiff notes in his reply, the Commissioner makes no argument in response to his second mental RFC claim of error. (ECF No. 25 at 5.)

**B.    Claim 2—The ALJ's Physical RFC Determination**

　　　1.    Parties' Arguments

　　　Plaintiff's next claim of error contends that the ALJ erred by omitting certain nonexertional limitations assessed by the state agency physicians from the RFC without explanation.  (ECF No. 19 at 13.)  Specifically, Plaintiff argues that the state agency physicians opined that Plaintiff was limited to "no constant or extreme overhead reach or stretch bilaterally that would involve extreme extension of the neck but can do at or below shoulder level 1/3 to 2/3 of the time" and "no extreme neck flexion or extension," but the RFC assessed by the ALJ simply included a limitation of "no overhead reach bilaterally." Plaintiff highlights that the only opinion evidence concerning his physical functional limitations is from the state agency physicians, and the ALJ fails to explain why he omitted this "critical work-related nonexertional function" from the RFC.  (*Id.* at 13–14.)

　　　The Commissioner's response to Plaintiff's claim of error focuses predominantly on a contention that Plaintiff does not challenge—that the ALJ properly relied on the state agency physicians' opinions, as their opinions were supported by substantial evidence.  (ECF No. 22 at 24–26.)  The Commissioner only briefly addresses Plaintiff's claim that the ALJ failed to include all nonexertional reaching limitations in the RFC and contends that the ALJ "translated" the state agency physicians' reaching limitations into the RFC.  (*Id.*)  Providing no authority for his position, the Commissioner maintains that the ALJ was otherwise "not required to incorporate additional limitations into the RFC, including the restriction of no extreme neck flexion or extension."  (*Id.* at 26.)

　　　In reply, Plaintiff argues that the Commissioner "offers an extensive record-based justification of the decision's idiosyncratic departure from the relied-on [state agency physicians'] physical RFC," which has "[nothing] to do with the decision's unexplained non-incorporation of the nonexaminers' limitations involving bilateral reaching below shoulder-level and no extreme neck extension."  (ECF No. 25 at 5–6.)  Plaintiff contends that the ALJ's changing of the state agency physicians' reaching limitations to "no overhead reaching" was not a trivial difference and necessitated an explanation.  (*Id.* at 6.)

2.   <u>Discussion</u>

    a.   *The hearing decision is internally inconsistent and fails to comply with SSR 96–8p.*

An ALJ is required to evaluate "every medical opinion" in the claimant's case record. 20 C.F.R. § 404.1527(c). Although an ALJ is "not required to adopt" the findings of a state agency physician, 20 C.F.R. § 404.1513a, the ALJ must consider their opinions as opinion evidence, and determine the weight to be given such opinions, 20 C.F.R. § 404.1527(c). Further, an ALJ's RFC assessment "must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR 96–8p, 1996 WL 362207, at *7.

Here, the ALJ discussed the state agency physicians' physical RFC assessment of Plaintiff as follows:

> Initially and on reconsideration review, the [s]tate agency medical consultants limited the claimant to carry, push, and pull 10 pounds frequently and 20 pounds occasionally; stand and/or walk for 6 hours, with normal breaks; sit for 6 hours, with normal breaks; occasionally able to climb ramps and stairs; never climb ladders, ropes or scaffolds; <u>no constant or extreme overhead reach or stretch bilaterally that would involve extreme extension of the neck but can do at or below shoulder level 1/3 to 2/3 of the time</u>; avoid concentrated exposure to extreme cold, vibrations; avoid even moderate exposure to hazards; <u>no extreme neck flexion or extension</u> (Exhibits 1A and 3A). I have given substantial weight to these assessments as they are consistent with the minimal objective clinical findings, diagnostic studies, and course of treatment.

(AR 24 (emphasis added).) Despite giving the state agency physicians' opinions substantial weight and finding that they were "consistent with the minimal objective clinical findings, diagnostic studies, and course of treatment," the RFC assessed by the ALJ did not contain any nonexertional limitations for reaching at or below the shoulder level or for neck flexion/extension. (AR 21.) Instead, the RFC assessed a limitation of "no overhead reach bilaterally." (*Id.*)

Although an ALJ is not bound by the opinions of the state agency physicians, the Court cannot reconcile the ALJ's acceptance of the state agency physicians' opinions and determination that they were entitled to substantial weight with his failure to adopt the portions of their opinions regarding Plaintiff's ability to reach at or below shoulder level or the degree to which he could flex/extend his neck.  In discussing Plaintiff's severe neck impairment, the ALJ concluded that "the evidence of record does not warrant exertional or nonexertional limits more restrictive that that indicated [in the RFC.]"  (AR 22.)  Yet, the ALJ also found that the state agency physicians' opinions, which included more restrictive nonexertional limitations than the RFC, were consistent with the medical evidence.  (AR 24.)

The Commissioner maintains that the ALJ "translated" the state agency physicians' reaching limitations into the RFC by including a limitation of "no bilateral overhead reaching."  (ECF No. 22 at 26.)  This *overhead* reach restriction is more restrictive than the state agency physicians' limitation of "no constant or extreme overhead reach or stretch bilaterally that would involve extreme extension of the neck," and sufficiently encompasses the first part of the state agency physicians' reaching limitation.  However, a limitation of "no bilateral overhead reaching" does not encompass the second part of the state agency physicians' reaching limitation: "can do at or below shoulder level 1/3 to 2/3 of the time."  The Commissioner provides no explanation for this "translation" (more properly read as an omission) and seemingly simply ignored the fact that the state agency physicians opined that Plaintiff was limited to frequent reaching at or below the shoulder level.  As Plaintiff argues, "The decision's disappearance of the [at or] below-shoulder reaching limitation" and "changing . . . to 'no overhead reaching' was . . . not a trivial difference but rather one demanding" compliance with SSR 96–8p.  (ECF No. 25 at 6.)  Further, as to the state agency physicians' inclusion of the neck flexion/extension limitation, the Commissioner admits that "the ALJ did not directly address why he did not adopt the extreme extension of the neck in the RFC."  (ECF No. 22 at 26.)

///

Without any explanation from the ALJ regarding why he implicitly rejected the state agency physicians' opinions concerning these nonexertional limitations when assessing Plaintiff's RFC, the Court finds that the hearing decision is not only internally inconsistent but fails to comply with SSR 96–8p.  SSR 96–8p, 1996 WL 362207, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."); *see, e.g.*, *Brian T. v. Saul*, Case No. 5:18-cv-02271-MAA, 2020 WL 470387, at *3 (C.D. Cal. Jan. 28, 2020) (citing SSR 96–8p and stating that "an ALJ cannot 'implicitly' discount a competent medical opinion that conflicts with the ALJ's RFC determination"); *Perez v. Berryhill*, Case No. 2:17–cv–01800–GJS, 2018 WL 1918539, at *3 (C.D. Cal. Apr. 23, 2018) (finding that the ALJ erred when he "did not articulate reasons for rejecting [a] portion of the state agency consultants' opinions, as required by the Social Security regulations" (citing SSR 96–8p)).  Thus, the ALJ erred.

Moreover, as there were no medical opinions concerning Plaintiff's physical RFC in the record other than those of the state agency physicians, the ALJ seemingly relied on his own interpretation of the medical records to conclude that Plaintiff's severe neck impairment did "not warrant . . . nonexertional limitations more restrictive" than no bilateral overhead reaching.  (*See* AR 22.)  This, too, was error.  "An 'ALJ cannot arbitrarily substitute his own judgment for competent medical opinion,' and he 'must not succumb to the temptation to play doctor and make [his] own independent medical findings.'"  *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) (first quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), and then quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).  If the ALJ here suspected that the medial evidence concerning Plaintiff's severe neck impairment pointed toward less restrictive nonexertional limitations than opined by the state agency physicians, "the ALJ should have consulted a qualified medical expert to attempt to confirm or dispel [his] suspicion."  *Corr v. Astrue*, No. ED CV 11–7890–E, 2012 WL 1745607, at *5 (C.D. Cal. May 16, 2012).

///

///

b.     *The ALJ's error was not harmless.*

As stated above, the ALJ at Step Five determined that an individual with Plaintiff's age, education, work experience, and RFC would be able to perform the requirements of representative unskilled (svp-2) light occupations such as garment sorter, garment folder, or marker II.  (AR 27.)  In making this determination, the ALJ stated that he relied on the testimony of the VE.  (*Id.*)  In the only hypothetical the ALJ posed to the VE during the administrative hearing, the ALJ included a reaching limitation of "should not overhead reach bilaterally" but did not include an at-or-below-the-shoulder reaching limitation.  (AR 62.)  The VE testified that a hypothetical individual with such an RFC could not perform work as a floor installer but could work as a garment sorter, garment folder, or marker II.  (AR 62–63.)

According to the DOT, work as either a garment folder or marker II requires "constant reaching," where constant is defined as existing 2/3 or more of the time.  *Garment Folder*, DOT 789.687-066, 1991 WL 681266; *Marker II*, DOT 920.687-126, 1991 WL 687992.  The DOT's companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), defines reaching as "[e]xtending hand(s) and arm(s) *in any direction*."  SCO, App. C (emphasis added).  Thus, the constant reaching required by work as a garment folder and marker II is incompatible with the restrictions of no overhead reaching and limited reaching at or below the shoulders less than 2/3 of the time.  Had the ALJ included the state agency physicians' limitation that Plaintiff could reach at or below his shoulders only frequently in the RFC, work as a garment folder or marker II would be unavailable to Plaintiff according to the DOT.

However, the ALJ also found that Plaintiff could work as a garment sorter.  Unlike a garment folder or marker II, work as a garment sorter requires frequent reaching, where frequent is defined as existing from 1/3 to 2/3 of the time.  *Garment Sorter*, DOT 222.687-014, 1991 WL 672131.  Thus, the state agency physicians' opinion that Plaintiff could reach at or below his shoulders frequently seems to comport with the DOT's reaching requirements for a garment sorter.  As the ALJ identified at least one job available to

Plaintiff with significant numbers in the national economy, his error was seemingly harmless. Nevertheless, the Court cannot affirm the ALJ's decision that Plaintiff was not disabled on the basis that his RFC was compatible with work as a garment sorter. Plaintiff does not specifically raise this issue, but the Court's scrutiny of the Plaintiff's RFC with the DOT's requirements of a garment sorter, in addition to the requirements of a garment folder and marker II, has revealed an unexplained, apparent conflict between the VE's testimony and the DOT.

In making disability determinations, an ALJ relies primarily on the DOT for "information about the requirements of work in the national economy." *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007). In addition to the DOT, the ALJ "uses testimony from vocational experts to obtain occupational evidence." *Id.* Generally, the VE's testimony should be consistent with the DOT. *See* SSR 00–4p, 2000 WL 1898704 (Dec. 4, 2000); *Massachi*, 486 F.3d at 1153. But when conflicts do occur, neither the DOT nor the VE's testimony automatically trumps. *Id.* Instead, if "an apparent conflict [exists] between the [VE's] testimony and the DOT—for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle—the ALJ is required to reconcile the inconsistency." *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015) (citing *Massachi*, 486 F.3d at 1153–54).

As discussed above, the ALJ here included a nonexertional limitation of "no overhead reach bilaterally" in Plaintiff's RFC. (AR 21.) The ALJ included this limitation in the hypothetical he posed to the VE, and the VE's testimony confirmed that an individual who could not reach overhead bilaterally could perform work as a garment sorter, garment folder, and marker II. (*See* AR 62–63.) However, per the DOT, work as a garment sorter requires frequent reaching and work as a garment folder or marker II requires constant reaching. And again, the SCO defines reaching as extending hands and arms in any direction. Many courts in this district have discerned a conflict between the requirement of frequent or constant reaching in the DOT and a preclusion or restriction on reaching overhead or above the shoulder. *E.g.*, *Macias v. Colvin*, No. CV 15-9892-PLA, 2016 WL

19-cv-00779-WQH-JLB

5867405, at *5 (C.D. Cal. Oct. 6, 2016) ("[T]he three representative occupations as identified by the VE are defined by the DOT as requiring 'frequent' reaching, which appears to conflict with plaintiff's limitation to only occasional overhead reaching with his upper extremities."); *Marquez v. Astrue*, No. CV 11–339–TUC–JGZ, 2012 WL 3011779, at *3 (D. Ariz. July 23, 2012) (overruling the Commissioner's objections and finding a conflict between the VE's testimony that the claimant was limited in overhead reaching but could perform jobs that the DOT described as requiring frequent reaching); *see also White v. Colvin*, No. SA CV 16-82-E, 2016 WL 4402798, at *4 (C.D. Cal. Aug. 17, 2016) (collecting more than twenty cases). The Court therefore finds that there was an apparent conflict between the VE's testimony and the DOT.

Absent a reasonable explanation for the conflict, the ALJ could not properly rely on the VE's testimony as substantial evidence to support his disability determination. SSR 00–4p; *Massachi*, 486 F.3d at 1152–54. The Court notes that the ALJ did ask the VE whether the VE could provide consistent testimony with the DOT and whether the ALJ could assume that the VE's testimony was consistent unless otherwise stated, and the VE did not identify any conflicts between his testimony and the DOT during the hearing. (*See* AR 60–63.) This, however, did not absolve the ALJ of his responsibility to identify and resolve the apparent conflict between the VE's testimony and the DOT. As explained by the Ninth Circuit in *Massachi*, SSR 00–4p explicitly requires an ALJ to resolve conflicts between VE testimony and the DOT. 486 F.3d at 1153; *see also Norris v. Colvin*, No. EDCV 12–1687 RNB, 2013 WL 5379507, at *3 (C.D. Cal. Sept. 25, 2013) ("[T]he Commissioner's contention that the ALJ may rely solely on the VE's unsupported conclusion that there is no conflict between her testimony and the DOT cannot be reconciled with Ninth Circuit precedent requiring that the record clearly show how the ALJ resolved apparent conflicts."); *Marquez*, 2012 WL 3011779, at *2–3 ("*Massachi* . . . does not suggest that the ALJ need look no further than the VE's testimony in order to meet his/her obligation under SSR 00–4p to search for conflicts between the VE and the DOT. . . . The ALJ cannot simply rely on the VE's testimony that no such conflicts exist.").

Neither the VE nor the ALJ recognized the conflict between the VE's testimony and the DOT's reaching requirements, and consequently, there is no explanation in the record that might support preferring the VE's testimony over the DOT.  *See* SSR 00–4p ("Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict.").

Accordingly, the Court finds that the ALJ erred when he failed to identify and resolve a conflict between the VE's testimony and the DOT.  The ALJ could therefore not rely on the VE's testimony and thus, his Step Five determination that Plaintiff could perform work as a garment folder, garment sorter, or marker II was not supported by substantial evidence.  Further, because the ALJ did not identify any other jobs that Plaintiff could perform, the ALJ's error was not harmless.

**C.    Claim 3—The ALJ's Credibility Determination**

### 1.    Parties' Arguments

Plaintiff's final claim of error alleges that the ALJ failed to identify which of Plaintiff's symptom allegations he found not credible.  (ECF No. 19 at 14–15.)  Plaintiff asserts that ALJ failed "to make clear what allegations of [Plaintiff] [he] reject[ed]," and under Ninth Circuit authority, the ALJ was required to specifically identify "what testimony is credible and what evidence undermines the claimant's complaints."  (*Id.* at 14.)  In response to Plaintiff's argument, the Commissioner maintains that the ALJ properly discredited Plaintiff's symptom allegations.  (ECF No. 27 at 22.)  The Commissioner acknowledges that the ALJ was "required to make specific findings regarding [Plaintiff's] subjective allegations," but maintains that "[t]here is no requirement that the ALJ connect each of his reasons to discount Plaintiff's testimony to Plaintiff's allegations."  (*Id.* at 27, 31.)

### 2.    Summary of Plaintiff's Symptom Allegations

The Court summarizes Plaintiff's symptom allegations from his testimony at the administrative hearing, statements in his Function Report, and complaints in his medical records as follows:

///

Plaintiff came to the United States as a Russian refugee in 1997, having previously spent some time in the Russian military. (AR 54, 1259.) While in the Russian military, he was beaten "many times every day" for his religious beliefs. (*Id.*) He dreams that he is still in the Russian military "three [or] four time a week" and screams in his sleep. (AR 55.) He suffers from "deep depression" and anxiety due to his service as a Russian soldier. (*Id.*; *see also* AR 697, 701, 743, 784, 833.)

On February 22, 2014, Plaintiff was involved in a five-car motor vehicle accident. (AR 368.) Following the accident, he complained of dizziness, chest pain, left wrist pain, headaches, difficulty falling asleep, and pain in his cervical, thoracic, and lumbar spine. (AR 368, 493–94, 502, 1230, 1232.) In an initial chiropractic evaluation completed on February 26, 2014, he described the pain in his chest, neck, wrist, and back as a "constant aching" that was "sharper with movements of bending, reaching, or twisting." (AR 503.) He stated that before his accident, he had no pain. (AR 503.) He continued to have pain in his back, specifically his thoracic spine, in May 2014, seeing only "temporary improvement" from chiropractic care and some improvement from massage. (AR 428, 475, 667.) He described his thoracic pain as severe and frequent or constant during this time, fluctuating based on activity levels. (AR 431, 671.) His pain level was an eight to ten out of ten. (AR 671, 667.) In July 2014, he reported "no significant change in pain" after receiving trigger point injections. (AR 663.) He continued to report constant, sharp, stabbing thoracic spine pain in September 2014. (AR 520.)

In October 2014, he reported an 80% decrease in thoracic pain on his right side after a medial branch block ("MBB") injection, but "did notice some pain above [and] below" the MBB site. (AR 653.) In December 2014, he underwent a right thoracic radiofrequency neurotomy procedure ("RFN"), but reported in January 2015 that he was "having worsening of spasm rather than improvement" and had more pain in the lumbar region and upper left paraspinal muscles. (AR 693.) He also reported that his pain was improved at the MBB site, but he continued to report chest spasms, pain on the "other side" of his thoracic spine, low back pain, lower leg spasms, and weakness in his low back. (AR 643.)

He stated that he had tried muscle relaxants, but they "affected his walking when he tried." (AR 543.) He reported that his thoracic and chest pain was the same in February and March 2015. (AR 638, 724.)

Plaintiff testified at the administrative hearing that he was "completely disabled" by the end of 2014 and his wife and son had to drive him to work. (AR 47.) Around this time, he started to experience a "panic disorder like anxiety" with heart palpitations two to three times a day for two or three hours. (*Id.*) He tried to continue working but started to lose consciousness while at work. (*Id.*) He was "in so much pain" that he "didn't sleep during the night," and started "going to pain management." (AR 47; 317.) He wakes up two to three times during the night and has trouble focusing and concentrating because of his pain. (AR 55.) He takes medication for his pain, but it makes him sleepy. (*Id.*) He must nap a couple times during the day because he does not sleep well during the night and his pain medication makes him sleepy. (AR 56.) His naps last about an hour to an hour and a half. (*Id.*)

His medical records show complaints of heart palpitations and chest pains (AR 382, 540, 557, 563, 693, 777, 781, 806); painful muscle and chest spasms (AR 382, 540, 689, 704, 728); dizziness, lightheadedness, and loss of consciousness (AR 382, 540, 563, 728, 839, 1018); and difficulty breathing or speaking with chest pain (AR 777, 781). Because of his heart palpitations and anxiety, he is afraid to go outside, but he goes outside "a couples times a day." (AR 49, 319.) After he experiences heart palpitations, he "feel[s] like [he] cannot walk," and a doctor has recommended, but did not prescribe, use of a cane. (AR 51.) He uses a cane when he goes outside "to feel safe if [he] get[s] sudden heart palpitations or spasms." (AR 322.) He has stated that sometimes he is "in so much pain" that he "ends up losing [his] balance." (AR 781.)

As for daily activities, he mostly stays in bed but, he is able to make himself things like a sandwich or tea and can help his wife peel potatoes. (AR 56, 58.) He does not prepare meals because of his back and neck pain. (AR 318.) He reads with his children, calls his family on the phone, watches a preacher on YouTube, and goes to church every

Sunday with his wife or son.  (AR 56–57, 320.)  He rarely leaves his home by himself (maybe once a month), and he cannot go out alone because of his "sudden heart palpitations." (AR 57, 319.)  He does not grocery shop.  (AR 57.)  He cannot drive because of his "sudden heart palpitations" and "neck and chest spasms." (AR 319.)  His wife helps him to shower, but he can brush his teeth by himself.  (AR 57.)  Sometimes he asks for help to dress because of his "back problem." (AR 317.)  He needs reminders to make his doctors' appointments and to take his medications.  (AR 318.)

He cannot lift more than two pounds and can only walk five to ten minutes before needing a rest.  (AR 321.)  After half an hour he can walk for another five minutes.  (*Id.*)  He can pay attention for one hour "with prescribed medications." (*Id.*)  He gets stressed and experiences "neck and chest spasms" when he interacts with authority figures.  (AR 322.)  If he does not take his medications before he talks to someone, he "get[s] palpitations." (*Id.*)

3.   Legal Standard

In determining whether a claimant is disabled, the ALJ must consider all of a claimant's symptoms, including the claimant's "statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and . . . ability to work." 20 C.F.R. § 404.1529(a); *see also* SSR 16–13p ("In determining whether an individual is disabled, we consider all of the individual's symptoms, including pain . . . .").  The Ninth Circuit has established a two-part test "to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)).  At the first step, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (citations omitted).  If the claimant satisfies the first step and there is no determination of malingering by the ALJ, "the ALJ can reject the claimant's testimony about the severity of [his]

symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1282.

In weighing the credibility of the claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Id.* at 1284. The ALJ may consider the "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work records, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). If the ALJ's credibility finding is supported by substantial evidence in the record, the court may not engage in second-guessing. *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citing *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999)).

General findings, however, are insufficient; the ALJ must "specifically identify the testimony from a claimant [the ALJ] finds not to be credible and . . . explain what evidence undermines this testimony." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014); *accord Smolen*, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); *see also Vasquez v. Astrue*, 572 F.3d 586, 592 (9th Cir. 2009) ("To support a lack of credibility finding, the ALJ [is] required to point to specific facts in the record."); *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) ("The ALJ must provide clear and convincing reasons to reject a claimant's subjective testimony, by specifically identifying what testimony is not credible and what evidence undermines the claimant's complaints."). The ALJ's findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Thomas*, 278 F.3d at 958.

4. <u>The ALJ erred by failing to identify the specific symptom testimony he attempted to discredit.</u>

After assessing Plaintiff's RFC, the ALJ began his credibility determination with the following boilerplate language:

///

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16–3p.  The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527.
>
> . . . .
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.[9]

(AR 21.)  The ALJ continued, repeating himself in part:

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 96–4p and SSR 16–3p.  The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96[–]2p, 96–5p, 96[–]6p and 16-3p.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  The following is an evidence-based analysis of the administrative record to determine whether the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are as limiting as alleged.

(AR 22.)  The ALJ completed the first step of the two-part credibility test and determined that Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms.  Because the ALJ did not find that Plaintiff was malingering at the second step, the issue before the Court is whether the ALJ provided specific, clear, and convincing

---

[9]     The Court notes that the Ninth Circuit has rejected similar boilerplate statements as insufficient to meet the ALJ's duty to identify what testimony of a claimant he is discrediting.  *See Brown–Hunter*, 806 F.3d at 493–94; *Treichler*, 775 F.3d at 1102–03.

reasons for rejecting Plaintiff's testimony regarding the severity of his symptoms.  The Court finds that the ALJ failed to meet this burden.

Apart from perhaps a single instance, the ALJ failed to specifically identify which of Plaintiff's symptom statements or what testimony of Plaintiff he found not credible.  In the two pages that follow the ALJ's step one determination that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the Court struggles to find a concrete instance where the ALJ identified a specific symptom allegation made by Plaintiff.  As discussed by both Plaintiff and the Commissioner, the ALJ made several findings, which, if tied to specific symptom allegations, could be bases for discrediting a social security claimant.  (*See* ECF Nos. 19 at 14–15; 22 at 28–30.)  However, the Court agrees with Plaintiff that the ALJ never adequately identified what statements or testimony he sought to discredit.  The Commissioner asserts, without citation, that "[t]here is no requirement that the ALJ connect each of his reasons to discount Plaintiff's testimony to Plaintiff's allegations" (ECF No. 22 at 31), but this is *exactly* what the law requires.  *See Brown–Hunter*, 806 F.3d at 494 ("Because the ALJ failed to identify the testimony she found not credible, she did not link that testimony to the particular parts of the record supporting her non-credibility determination.  This was legal error."); *see also Kenneth M. v. Saul*, Case No.: 3:19-cv-00110-AJB (RNB), 2019 WL 4674317, at *3 (S.D. Cal. Sept. 25, 2019) ("[I]t was incumbent on the ALJ to state specifically which symptom testimony was not credible and what facts or evidence in the record supported that conclusion."), *adopted by* 2019 WL 6052415 (S.D. Cal. Nov. 15, 2019).  And, as Plaintiff argues, just because the reasons the ALJ provided for discrediting Plaintiff "can be bases" for discrediting a claimant, that does not "mean this decision properly discredited [him]." (ECF No. 25 at 7.)

For example, the ALJ wrote that, "[d]espite [Plaintiff's] allegedly disabling impairments . . . he was noted to be 'quite active' and 'continue[d] to work when he had emergency room palpitations in 2015.'" (AR 22.)  The ALJ, however, did not link any specific testimony or statement to this potentially undermining evidence.  *See Isis A. v.*

*Saul*, No. 18CV01728-W-MSB, 2019 WL 3554969, at *5 (S.D. Cal. Aug. 5, 2019) ("The ALJ's generic references to Plaintiff's statements as 'complaints of disabling symptoms and limitations,' did not specifically identify the statements that the ALJ was discrediting."), *adopted by* 2019 WL 3891076 (S.D. Cal. Aug. 19, 2019); *Eldridge v. Berryhill*, No. 17CV497-JLS (BLM), 2018 WL 2357147, at *8 (S.D. Cal. May 23, 2018) ("The ALJ's vague references to Plaintiff's statements as 'allegations of disabling limitations' are not specific identifications of which statements are being discredited."), *adopted by* 2018 WL 3343099 (S.D. Cal. July 9, 2018).   In discussing Plaintiff's PTSD, anxiety, and depression, the ALJ wrote that "he had not had any regular ongoing mental health treatment for significant depression and high anxiety." (AR 23.)  However, the ALJ did not identify the testimony or statement he sought to discredit by finding that Plaintiff had not had regular and ongoing mental health treatment.

In two standalone paragraphs, the ALJ wrote:

The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual.  The claimant's course of treatment since his alleged disability onset date has generally reflected a conservative approach.

. . . .

Although the claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in his favor, the objective medical evidence shows that the medications have been relatively effective in controlling the claimant's symptoms.  Moreover, the claimant has not alleged any side effects from the use of medications.

(*Id.*)  Not only did the ALJ fail to identify the testimony he sought to discredit with these findings, but the ALJ's vague statements, which contain no citation to the record, leave the Court wondering what treatment the ALJ found to be conservative and what medications the ALJ found to be effective in controlling which symptoms.  And, contrary to the ALJ's finding that Plaintiff had not alleged any medication side effects, Plaintiff testified at the

hearing that the medication he takes for pain makes him sleepy.  (AR 55–56.)  Plaintiff also reported that muscle relaxants affected his walking (AR 543), and Dr. Kushnir noted in his Mental Impairment Questionnaire that Plaintiff experienced "occasional dizziness and drowsiness" from his medications (Abilify, Zoloft, and Wellbutrin) (AR 1223).

The ALJ also attempted to undermine Plaintiff's credibility by stating that his "allegations of significant limitations are not borne of out his description of his daily activities."  (AR 24.)  But, the ALJ's vague reference to "allegations of significant limitations" is not an identification of a specific statement.  Moreover, nowhere in the hearing decision does the ALJ specifically set forth, or even summarize, Plaintiff's description of daily activities.  The Commissioner maintains that the ALJ "properly noted" that Plaintiff's activities of daily living were inconsistent with his alleged symptoms because "Plaintiff claimed he lied down all day and did not leave the house" but was able to "work[] part-time with his son[,] . . . help with household chores[,] and attend church." (ECF No. 22 at 30.)  Nowhere does this analysis appear in the hearing decision, and the Court "may not affirm the ALJ on a ground upon which he did not rely."  *Orn*, 495 F.3d at 630; *see also Lambert v. Saul*, 980 F.3d 1266, 1278 (9th Cir. 2020) ("'[T]he credibility determination is exclusively the ALJ's to make,' and '[w]e are constrained to review the reasons the ALJ exerts.'" (alteration in original) (quoting *Brown–Hunter*, 806 F.3d at 949)).

The ALJ came closer to meeting the requisite specificity standard when he discussed Plaintiff's complaints of "disabling pain and weakness."  (AR 23.)  Specifically, the ALJ wrote that that:

> [i]n contrast to the allegations of the claimant's disabling pain and weakness, he does not exhibit any significant atrophy, loss of strength, or difficulty moving that are indicative of severe and disabling pain.  Most progress notes document a normal gait that is well balanced; with normal heel and toe and tandem gait; and without the need for assistive devices (Exhibits 3F/8; 4F/33; 7F/11).  However, he was noted to be walking with a cane in January 2015 when he had gait disturbance (Exhibit 10F/16-20).  In May 2015, he stated that he did not have any difficulty walking, did not need help getting in or out

of a chair; uses a cane that was recommended but not prescribed to help with his chest palpitations, and did not have any falling episodes (Exhibit 12F/10).

(*Id.*)  Although the ALJ cited to specific, potentially-undermining evidence, he did not identify—either explicitly or by citation—what allegations of pain from which of Plaintiff's medically determinable impairments he sought to undermine.  Moreover, to the extent the ALJ's reference to Plaintiff's "allegations of . . . disabling pain and weakness" included Plaintiff's statements of disabling pain stemming from his heart palpitations and chest spasms, the Court finds that the ALJ failed to provide a clear and convincing reason for discrediting these statements.

As detailed above, Plaintiff complained of disabling pain stemming from his heart palpitations and chest spasms.  (*See, e.g.*, AR 563, 689, 781, 806, 839).  For instance, at a consultation at Pacific Arrhythmia Service, Inc. on May 16, 2014, Plaintiff described his heart palpitations as so "debilitating" and painful that sometimes he could not breathe or speak when experiencing them.  (*See* AR 563.)  In discrediting Plaintiff's claims of pain and weakness, the ALJ cites to objective medical evidence demonstrating that Plaintiff's gait was mostly normal and statements from Plaintiff that he did not have difficulty walking or moving.  If this evidence was intended to discredit Plaintiff's claims of chest pain, the ALJ failed to explain how Plaintiff's statements regarding his general ability to walk and move, and the objective medical evidence of the same, discredited his statements regarding the pain he experiences during a heart palpitation or chest spasm episode.  Even when reviewing the medical record to which the ALJ cites in his last sentence, the Court cannot glean the reasoning behind the ALJ's credibility determination.  Plaintiff's statements concerning his ability to walk and move and use of cane referenced by the ALJ are derived from a checkbox functional assessment completed as part of a nursing evaluation when Plaintiff was admitted into the Tri-City Medical Center Intensive Outpatient Program for his mental impairments.  (AR 750.)  In this functional assessment, a "no" box was marked next to questions of whether Plaintiff had difficulty walking, needed help getting out of a chair, or had fallen in the last six months.  (*Id.*)  No other detail was provided.  Further, as

noted by the ALJ, the same functional assessment reported that Plaintiff used a cane when experiencing heart palpitations.  A "yes" box was marked next to a question of whether Plaintiff needed special equipment for getting in or out of a chair or with walking, and alongside the checkbox is a handwritten note stating, "[patient] uses a cane to help [with] chest palpitation[s]."  (*Id.*)  Plaintiff testified at the hearing that after he experiences heart palpitations, he feels as though he cannot walk, so he uses a cane as a preventive measure. (AR 49; *see* AR 322.)  When seemingly describing his heart palpitations during a therapy session with Dr. Karimi, Plaintiff stated that sometimes he would be "in so much pain" that he would lose his balance.  (AR 781.)  And, although Plaintiff reported that he had not had any falling episodes in the six months prior to the May 2015 functional assessment, Plaintiff subsequently reported that he "fell down and passed [out]" on May 20, 2016.  (AR 839; *see* AR 1006.)

Thus, to the extent the ALJ's general reference to Plaintiff's allegations of "disabling pain and weakness" included Plaintiff's statements of disabling pain stemming from his heart palpitations and chest spasms, the ALJ failed to explain the nexus between those statements and the evidence that purportedly undermines them.  Accordingly, the Court cannot find that the ALJ met the demanding clear and convincing standard to discredit Plaintiff's allegations of disabling pain stemming from his heart palpitations and chest spasms.

The only instance in the hearing decision where the ALJ specifically identified Plaintiff's symptom statements with citations to the record and linked them to discrediting reasons is at Step Two, where the ALJ found that Plaintiff did not have a severe back impairment.[10]  In making this determination, the ALJ wrote:

The claimant has complained of back pain after the February 2014 motor vehicle accident.  (Exhibits 1F, 2F, 8F, 9F, 10F, 12F, 20F).  All imaging of

---

[10]   The ALJ incorporated this analysis by reference into his credibility determination. (AR 22.)

the lumbar and thoracic spine ha[s] been unremarkable (e.g. Exhibit 20F/6[)]. Physical examinations of the lumbar spine and thoracic spine have not revealed any significant abnormal clinical findings.  He has been treated very conservatively with medication management, physical therapy, chiropractic treatment, massage, and acupuncture.  No severe back impairment is established by the record.

(AR 20.)  Assuming the ALJ was specific enough in identifying the statements he was discrediting with this analysis, the Court does not find that the ALJ provided clear and convincing reasons for discrediting Plaintiff's "complain[ts] of back pain."  Evidence of conservative treatment can serve as a basis for discrediting a claimant's testimony regarding the severity of an impairment, but the treatment Plaintiff sought for his thoracic spine pain cannot reasonably be characterized as "very conservative."  First, the record shows that Plaintiff was prescribed opioids for his pain, 5mg of oxycodone up to four times a day (*e.g.*, AR 634) or 10mg of hydrocodone up to three times a day (*e.g.*, AR 644). Second, in addition to prescription opioids, physical therapy, and chiropractic treatment, Plaintiff sought to treat his thoracic spine pain with MBB injections and underwent an RFN procedure (AR 523, 528).  The hearing decision fails to mention these treatments, and many courts in the Ninth Circuit have rejected characterizations of MBB, RFN (also known as radiofrequency ablation), and similar treatments as conservative.  *E.g.*, *Martinez v. Berryhill*, Case No. 2:17–cv–00770–GJS, 2018 WL 1415163, at *8 (C.D. Cal. Mar. 20, 2018) (rejecting the ALJ's characterization of radiofrequency ablation as conservative); *Pontzious v. Berryhill*, No. 3:16-cv-8274-HRH, 2017 WL 6276371, at *7 (D. Ariz. Dec. 11, 2017) ("[E]pidural injections and medial branch blocks are not conservative treatment."); *Bradley v. Comm'r of Soc. Sec.*, No. 2:14-CV-1771-CMK, 2016 WL 1047015, at *4 (E.D. Cal. Mar. 16, 2016) (finding that branch block injections, along with narcotic pain medications, were not conservative treatments); *Kephart v. Colvin*, No. ED CV 13–1270–SP, 2014 WL 2557676, at *5 (C.D. Cal. June 6, 2014) ("The court agrees with plaintiff that Toradol injections and medial branch block treatment would not be considered conservative treatments.").  The ALJ's remaining reason to discredit Plaintiff's

allegations of back pain was that it was not consistent with the objective medical evidence;[11] however, this reason cannot constitute the sole reason supporting an adverse credibility determination.  *Reddick*, 157 F.3d at 722 ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." (citing *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (en banc)); *see also Light*, 119 F.3d at 792 (holding that "a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain").

Aside from this one instance, the hearing decision fails to connect any other symptom allegations from Plaintiff to evidence in the record undermining them. Accordingly, the ALJ's credibility determination is not sufficiently specific such that the Court is able "to conclude that the ALJ did not arbitrarily discredit [Plaintiff's] testimony." *Thomas*, 278 F.3d at 958.  Further, given the severity of some of the symptom statements made by Plaintiff as described above, the Court is unable to determine that the ALJ's error was harmless.

## D.    Remand is Appropriate

The law is well established that the decision whether to remand for further proceedings or simply to award benefits is within the discretion of the Court.  *See, e.g.*, *Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989); *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision.  *See, e.g.*, *Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir.

---

[11]    Moreover, the ALJ's finding that "[a]ll imaging of the lumbar and thoracic spine ha[s] been unremarkable" is not supported by substantial evidence.  (AR 20 (emphasis added).)  Not all physicians who reviewed Plaintiff's thoracic spine MRIs found them unremarkable.  (*E.g.*, AR 504 ("My review of MRI films reveals hyperkyphosis mid and upper thoracic with mild anterior disc desiccation multiple levels.").)

1984); *Lewin*, 654 F.2d at 635.  Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, *Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1980), where the record has been fully developed, *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986), or where remand would unnecessarily delay the receipt of benefits to which the disabled plaintiff is entitled, *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985).

The Court has concluded that this is not an instance where no useful purpose would be served by further administrative proceedings.  On remand, the ALJ may be able to provide legally sufficient reasons for rejecting Dr. Kushnir's opinion, resolve the conflict between the VE's testimony and the DOT concerning Plaintiff's reaching limitations, or specifically identify the symptom testimony he attempted to discredit.  Accordingly, remand is appropriate.

## VII.  <u>CONCLUSION</u>

For the foregoing reasons, the Court **RECOMMENDS** the following:

(1)     Plaintiff's Motion for Summary Judgment (ECF No. 19) be **GRANTED**;

(2)     The Commissioner's Cross-Motion for Summary Judgment (ECF No. 22) be **DENIED**; and

(3)    Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation must be filed with the Court and served on all parties no later than **<u>February 12, 2021</u>**.  The document should be captioned "Objections to Report and Recommendation."

///

///

///

///

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **February 19, 2021**.  The parties are advised that a failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  January 29, 2021

Hon. Jill L. Burkhardt
United States Magistrate Judge

19-cv-00779-WQH-JLB